Department of Health and Human Services. We just have one case this afternoon that has a lot of moving parts and we are grateful to have the help of very able lawyers to help us sort this one out. If I make any mistakes on the order of presentation, everybody has a free pass to correct me. Make sure I get everybody up here in the right order, adjusting the right issues. So I think, let's call the case, it's 149529 State of Wyoming v. EPA and we're going to split the case, argue basically into two segments. That's one on the Wyandak unit and then the second argument on one and two. So let's start with Wyandak and the petitioners in that case are the State of Wyoming and Pacific Corps. And I think going first, according to my notes, for the State of Wyoming is Ms. Leninger, is that correct? Okay, you may proceed and then we're going to be followed by Mr. Jones and then we're going to hear from the Environmental Protection Agency. You may proceed when you're ready. I'd like to reserve two minutes for rebuttal. Good afternoon, your honors. May it please the court. My name is Shannon Leninger and I'm counsel for the petitioner at the State of Wyoming. We're here today because EPA's non-binding guidance has only applied for a facility that's over 750 megawatts to a facility under 350 megawatts. To meet Congress's aesthetic goal, Congress gave states five factors to consider and weigh in determining best available retrofit technologies, or BART. In doing so, Congress does not assign any weight or significance to these factors, instead of leaving it up to state discretion. Wyoming indisputably conducted a five-factor analysis. We're here today because EPA did not like the state's approach. If that could interrupt, Mr. Wolpert, could you chop this down just a little bit, please? You may proceed. Sorry. Instead, EPA decided to require Wyoming to follow an approach that's only required for facilities twice WyoDAC's size. Even though EPA is statutorily required to approve Wyoming's BART determination, it meets the minimum applicable requirements of the Act. So how are they supposed to tell that you've met the minimum applicable requirements of the Act? Congress sets five factors to weigh, and they have to decide if it would interfere with those five factors. A good example is in North Dakota, where EPA actually showed that the visibility modeling in that case actually served to degrade visibility conditions, which would go against the purposes of the Act. Here, when EPA did not take that step, it's only pointing to a difference in the methodology from the guidelines. So we have the statutory factors, and that requires some evaluation weighing of those applicable requirements. And then we have these guidelines that also have kind of a similar-looking set of factors. And the EPA, as they describe it, considers them helpful guidance in their brief. I think you're saying they're mandatory guidance from your perspective, but why can't the guidelines shape the agency's evaluation of the five statutory factors? Because Congress stated that for EPA to disapprove of this, they have to prove that it goes against the applicable requirements of the Act. So it has to be an applicable requirement from the Act itself. It cannot be non-mandatory guidance. Especially since Congress explicitly stated that emissions limitations are to be decided by these guidelines for facilities over 750 megawatts, I don't think it was Congress's intention for EPA to use these guidelines also to disapprove of this for a state. They found your cost evaluation and your visibility modeling to be deficient. Don't those fall within the five statutory factors? And if you agree with that, then why doesn't that give EPA some discretion to critique, evaluate your SIP? Presumably that critique involves the power to disapprove when they don't think it's reasonably meeting progress. The reason that the visibility modeling costs of compliance factors don't allow for a SIP to be disapproved is because EPA bases disapproval and differences in methodology in the guidelines. For example, for the visibility, for having multi-pollutant modeling, that is sourced in the guidelines and the baseline emissions formula that they pointed out is only a non-binding recommendation in those guidelines themselves. And cost of compliance focusing on capital costs is a reasonable interpretation of cost of compliance. So your position is not that EPA can't look at your SIP. It's that the problem in this case was their rejection of your SIP was based on the fact that you didn't use the guidelines. Is that your position? Yes. We believe that any disapproval has to be rooted in the language of the Act itself. They cannot use the guidelines as a shortcut for that disapproval. Okay. So they could have come forward with scientific modeling suggesting that your visibility monitoring was inappropriate or they could have come forward with some kind of cost analysis to make the same demonstration as long as the justification in your mind wasn't just, look, it doesn't comply with our guidelines. Yes. In North Dakota, they did just that. They showed that the visibility modeling done by North Dakota that used the multi-pollutant modeling showed to be great visibility conditions in that case. And they also showed that they had grossly erroneous numbers in their data. EPA did not show that here. Instead, they based it on saying that it didn't allow for an apple-to-apple comparison, which in the Act, part of it is for specific analysis. So that's not grounded in the Act. But it's a source-specific analysis for each pollutant. And so why would it be arbitrary for the EPA to say that when Wyoming submitted the SIP for nitrogen oxides, it included particulate matter and sulfur dioxide along with nitrogen oxide? Why would that be considered arbitrary and capricious? It's arbitrary and capricious because the specific core specifically showed in the comments about how you can identify the differences in visibility using that modeling for each pollutant and the new source control. And EPA did not base its approval in whether it served to be great visibility conditions or couldn't show visibility improvement. It was that the modeling didn't allow for apple-to-apple comparisons. Well, I mean, isn't that irrational? I mean, you have to apply those five statutory factors for each pollutant. And here we're only obviously talking about nitrogen oxides. So didn't Wyoming and the SIP Corp. need to isolate the costs, the average costs, the average incremental costs, all of the analysis to tailor it to nitrogen oxides, even if it might be possible to disaggregate the visibility effect of the particulate matter and sulfur dioxide? Well, Wyoming had the discussion to use a multi-pollutant modeling and it was able to show the differences in visibility from those controls and it was able to show into this analysis. And I think it's also important to note that nitrogen oxide is a very small contributor to regional haze in Wyoming. The largest contributors by far are particulate matter and sulfur oxide. Why does that matter? Because we're not talking about the sulfur dioxide regulations. We're only talking about the part of the regional haze rule and the cleaning act which talk about the need to create the best available retrofit technology for each pollutant. For each pollutant... I'll answer questions and then I have to consume my time to pick up the clock. For each pollutant... First, both the haze rules say that it must be based on analysis of each BART-eligible source and we believe that we did that. And second, it matters because those BART services, particulate matter and sulfur oxide, were approved by EPA and have either not been challenged or have been approved by the court. And I'll consume my time. All right, let's hear from Mr. Jones. Thank you, Your Honors. Good afternoon. For the record, my name is Steve Jones representing Pacific Corps. May it please the court, I think I can address Judge Tinkovich and Judge Carson's questions in a way that I think will present a framework that we can analyze this. There's two burdens here. The state has a burden that it has to produce a SIFT. And that's where the five factors come into play. The state has to evaluate five factors and they're competing factors. If you can't have one override the other, the state implicitly has to have a reasonable approach to doing that and that addresses one of EPA's arguments that we didn't actually, we meaning the state of Wyoming, undertake a reasonable analysis. But if the state does that, and the record is very clear that the state met its burden to analyze the five factors that Judge Carson brought up, then the burden shifts to EPA to perform its duty. Its duty is a very narrow one. It's not truly ministerial. We are not arguing that. What we are saying is that EPA, per the statute, Congress directed that EPA shall approve a SIFT if the state is satisfied its burden and can only not approve if they can point to applicable factors that the state violated when it put its SIFT together. So that's how those two harmonize when Judge Tinkovich is asking, well, how does that analysis, can't they analyze those factors? The answer to that question is no, only if those factors are applicable and that they can show that the state violated those factors. And so our position is stated very simply is that the control cost manual and the BART guidelines are not applicable factors. And for EPA to be able to do what is relatively minor tweaking as to visibility, as to cost applied, those are not applicable factors that rise to the level to get you to that 7410K3, that's the statutory side of the Clean Air Act, that says you shall approve. That's a congressional mandate that says this is what your role is. The state has a burden, then EPA has a burden. Well, what's an example of when the EPA can disagree with the state's weighing of the five factors? If, for example... Yeah, I think that's a great question. Yeah. So if the state didn't meet its burden, if the state said, okay, we are going to impose cost controls of a dollar, or we are going to impose a deficit level that is just so minuscule that we're not meeting congressional requirements, that's exactly the opposite of what Wyoming did. I mean, the record is really robust that they didn't foreclose anything on cost controls. Even SCR, the most expensive emission control that was available, Wyoming said, we find this to be cost effective. But for reasons that analysis, that five-factor analysis, cost competes with visibility improvement, competes with the remaining life of the plant, we are finding that on that analysis we're going to come up with the bar analysis that we did and the fit that we did. I want to quote to the court its own language, just to highlight that this is not just a position of advocacy. This is from the Oklahoma decision that the court issued and which EPA relies on very heavily. Quoting, here again it is the state which determines what constitutes best available control technology. And that, having been done, is what triggers EPA's duty. And EPA's duty is narrowly circumscribed. Right from the outset when the regional haze rule was adopted way back in 77, Senator Muskie, and we cited this in the record, said these guidelines will not apply to small plants like WIDAC. And again, in the Oklahoma case, you took a consistent position because in that instance those guidelines did apply. So that would be the answer to your question, that this court found in Oklahoma where those guidelines were applicable and they were violated, that EPA had the authority, in fact had the duty, because 7410L says you can't approve if a state violates an applicable factor. And that's exactly what happened in Oklahoma. If Wyoming used the guidelines to channel its proposal, its SIP, how can it fault EPA then for using the guidelines to assess the reasonableness of the SIP? Because ultimately isn't that what EPA did? It said that this was not a reasonable application of the factors to a defensible SIP. The reason that it can do that is because of those two different burdens and the way that they're approached. Wyoming can't take into account in doing that five-factor analysis information that applies to those factors, and they don't have that same congressional mandate on the applicable requirement that EPA does. That's the difference. That's why Wyoming, when it's doing its five-factor analysis, can look to the guidelines just like it can look to visibility analysis, just like it can look to modeling, just like it can look to cost constraints. Once it has done that and generated a reasonable SIP that meets those five factors, EPA has a very different constraint on it. Can EPA reject a SIP for a failure of the state to reasonably apply one of the five statutory factors, for example, visibility? Only if that is an applicable factor. Visibility is an applicable requirement. It's one of those five factors. But recognize that those five factors don't jive. I understand, and it's not a trick question. No, I understand. I'm just asking, trying to get at Judge Tinkovich's question, without talking and answering, what exactly is EPA charged with doing? If a state, hypothetically, unreasonably applies one of the visibility criteria, for example, if it says that nothing under one test of view will qualify and will be required because it's imperceptible to the naked eye, if, hypothetically, we were to say, well, that is unreasonable to use that as a benchmark, would that be within the domain of the EPA to say, even in Rocahoma versus EPA, that is a violation of the CAA because the SIP considered visibility, but it did it in an unreasonable way? Understood, Your Honor. I know that I've got two minutes, and Ms. Langer, if you're okay with me taking the time to answer your question, I'd like to do that. I'll give her a little time. Okay, fair enough. All right. The answer to your question, Your Honor, is that if the state exercised its discretion, its five-factor analysis in a completely unreasonable way, which is the way I understand your hypothetical to be proposed, it would not have met its burden that I, you know, when I did the two-burden analysis. The state has an obligation. It cannot ignore, it cannot enact in an unreasonable fashion, it cannot ignore any of those five factors. And so, to take your hypothetical, if the state said, no decimals, we don't care, or costs be damned, we're just going to do whatever we want, they would not have met their burden. And at that point, EPA would be justified in saying, the state hasn't even provided us a SIP which meets the burden. That's not the circumstance we have here. We have a state which did a very good job of doing the five-factor analysis, submitted a reasonable SIP that used all of those five factors. At that point, EPA's role becomes very different. At that point, EPA might... EPA might, just, sorry to interrupt, but to be a little more granular. Believe me, Your Honor, you're entitled to interrupt. EPA might say, well, Wyoming didn't really evaluate SDR technology. They blew it off because they assumed that it wouldn't provide adequate visibility improvement. Why couldn't EPA consider that an unreasonable assessment of that fifth factor having to do with reasonably anticipated results from technology differences? Well, I can answer that the same way I answered Judge Favrek's hypothetical, because that's not what the record is. And I'm happy to do that, but I want to emphasize before going down that path, that that's exactly not what Wyoming did. Wyoming very much considered SDR. Wyoming said, we're not even going to say that SDR is not cost-effective, even though it is exorbitantly costly. But we find that doing our five-factor analysis, it's not the appropriate solution here. And the state, as the court pointed out in Oklahoma, is the one that makes that initial call. EPA's going to stand up in a second, but why don't you frame what you think their argument is regarding the visibility standard and then respond to it. Okay. And I'll let you frame it however you want. They get a piece, and I will be as fair as I possibly can, consistent with my role as Pacific Course lawyer. Remember that in 2012, EPA rejected SDR. And then remember that in 2013, EPA once again rejected SDR. And the significant thing is that they did change their mind in 2014, but the record shows that they did it for reasons that were not consistent with the way they'd applied their own regulations before. The death of view reduction for SDR in the 2014 rule was actually lower than it would have been in 2012 and 2013 when they rejected SDR. The cumulative. The cumulative. That's correct. Not the wind cave, which was .61. That's correct. But recognize what the state's burden is. The state can't, if it's going to be reasonable and do that five-factor analysis appropriately, select any one of those Class I areas and say, we are going to emphasize, and this just goes to your hypothetical, we're going to emphasize wind cave over any of the other Class I areas. That would be an unreasonable approach. And at that point, I think EPA, to come back to, sorry about that, to come back to the question that Judge Tinker has asked, would be justified in saying, you didn't do your job. And until you do your job, we can't do our job. The thing for the court to remember, though, is that jobs are different. Once Wyoming does its job, and I would argue strenuously that they did a very good job in this instance, as exemplified by the fact that EPA agreed with them in 2012 and agreed with them in 2013, then EPA has a very limited job. Why can't EPA hypothetically say, it is unreasonable for Wyoming to look at the cumulative effect on visibility over all of the Class I areas, relying on the .47 of the 2012 proposed rule or .4 in the 2013 proposed rule, and to say, look, the whole point of this part of the CAA is to protect the visibility conditions for these Class I areas. Wind cave is this vital Class I area, and it may not have an effect on other areas in Wyoming, but it is going to have a huge, you know, over .6 effect on this one Class I area, and that was totally neglected in Wyoming SIF. So why is that, why can't, why is it arbitrary for EPA to say, that was an unreasonable way of looking at the visibility criteria? Because Congress said they couldn't. That's what they said. They couldn't focus on just one Class I area? No, no, that's not, with respect, Your Honor, that's not the question you posed. What you said was, why couldn't EPA use a reasonable analysis? And we can look at wind cave, we can look at SDR, there's a number of factors that EPA could say, well, you just did it unreasonably. That is, in fact, exactly what they did. And the reason that I'm standing here is to say to you, Congress did not allow EPA to exercise its statutorily delegated authority in that manner. They circumscribed. They said in order to approve a SIF, if Wyoming has presented a SIF, that by its terms is reasonable, and, you know, understand it's best available under five statutory factors that are reasonable. So reasonable binds are going to differ. It would be incredible that everybody would say, this is the exact analysis, which is exactly why Congress said if you are going to overturn the state having exercised its primary duty, which, again, this Court said in Oklahoma, that's the state's job, you have to show that there are applicable requirements that have not been met. And if you cannot do that, you shall approve. That's not my language. That's not advocacy. That's Congress. All right, counsel. Appreciate the argument. Let's hear from the EPA with respect to why it not. And that is going to be Ms. Langberry first. Yes, Your Honor. You may proceed. Good afternoon, Your Honors, and may it please the Court. My name is Amanda Langberry, and I represent the United States. Along with my co-counsel, Ms. Sonya Shea, I will address the WIADAC petitions, and Ms. Shea will address the NAWQA petitions. I'd like to quickly address EPA's rulemaking globally before diving into the WIADAC arguments. Wyoming's state implementation plan, or SIF, for nitrogen oxide controls, covers 13 units of five power plants, and EPA approves the bulk of those determinations of the best available retrofit technology or part. EPA's review is consistent across all units, and EPA approves the state's bar determination whenever it found that determination consistent with the requirements of the Clean Air Act and the Regional Haze Rule. Even where EPA could have disapproved the determination based on flaws in the state's analysis, or where EPA might have reached a different result had the agency conducted that analysis in the first instance. And this Court should affirm EPA's actions with regard to WIADAC for three overarching reasons. First, EPA reasonably disapproved Wyoming's bar determination for NOx-controlled WIADAC because it failed to perform two types of visibility modeling required by the Clean Air Act and the Regional Haze Rule. And it used unreasonable input in both its evaluation of the anticipated visibility improvement and cost of compliance, leading it to unreasonably select combustion controls as BART. Second, EPA's federal implementation plan, or FIF, for WIADAC, appropriately corrects for these errors and reasonably determines that BART for WIADAC is Selective Catalytic Reduction, or SER, combined with combustion controls. And finally, your honors, EPA's actions are consistent with both its statutory oversight authority and its ability to use the BART guidelines as helpful guidance. The Clean Air Act and the Haze Rule authorize EPA to do more than simply remember stamps of submission They require EPA to substantively review steps for compliance with their requirements and specifically hear the five BART factors. Which of the five factors, statutory factors, did Wyoming violate? Specifically... How did they do so? Wyoming failed to consider the anticipated visibility improvements that would result from the installation of various NOx controls and also the cost of compliance associated with the installation of those controls. They did a visibility study and they did supply cost information. Is the problem that those two studies are completely arbitrary? Or is it more you disagree with the relative weight that they put on those assessments? The former, your honor, EPA's position is that Wyoming's consideration of those two factors was unreasonable. Specifically for the visibility improvements, it completely failed to provide types of visibility modeling that were required by the Clean Air Act and the Regional Haze Rule. What does that mean, the CALPAS model? The first is one that this court has already discussed, which is the visibility improvement that would result from the installation of NOx controls alone, which goes to the questions that you were asking, Judge Bacharach. Wyoming modeled the anticipated visibility benefits from two post-control scenarios, which included NOx controls but also with other controls for particulate matter and sulfur dioxide. So it was impossible for EPA or any other party to ascertain what the visibility benefits would be from the installation of NOx controls. Well, everybody at the EPA and Wyoming were able to go back and say, okay, well, even though there was cumulative effect on visibility, this is the effect on visibility from nitrogen oxide. This is the effect on visibility from sulfur dioxide. Are you saying that it was impossible for the EPA to figure out how much of the visibility degradation is attributable to nitrogen oxide? Yes, Your Honor. With post-control scenario A and B were the two control scenarios that Wyoming modeled. This is in the record at page 1207 and then 12 through 13. So in those scenarios, it modeled the visibility improvement that would result from combustion in one scenario from combustion controls with two other controls that control particulate matter and sulfur dioxide. For the second one, it modeled selective catalytic reduction in combustion controls with those additional controls for particulate matter and sulfur dioxide. So you can see the difference between post-control scenario A and post-control scenario B. So EPA admits and has never denied that it could tell the incremental visibility benefit of installing selective catalytic reduction. But it could not tell nor could any other party tell what visibility improvements were attributable just to the NOx controls. It could only tell that delta between the two post-control scenarios. And this violates the regional HAZE rules requirement to consider the SESS system of emission reductions for each pollutant. And that's 40 CFR 51.301. Well, didn't Wyoming... Wasn't their response to that is that looking at SCR, there's really two. One is that it's going to be a de minimis outcome and it's not worth studying because the cost of the equipment's going to far exceed the benefits, kind of a cost-benefit analysis. And secondly, they point to differing positions that they claim the agency took regarding SCR in previous SIPs and then SIPs for other plants. As I understand, those are two of their major thrusts at the agency's decision-making. What's your response to those two points? To the first point, Your Honor, I don't think that Wyoming's response that that doesn't really matter all that much is a sufficient response to Congress's mandate to apply controls that address each pollutant that affects regional HAZE. And it also is not a response that's sufficient under the regional HAZE rules requirement to evaluate the best system of emission for each pollutant. To your second question, Your Honor, EPA's analysis across the 2012, 2013, and 2014 rules reasonably evolved in response to comments. That's how the notice and comment process is supposed to work, and EPA listened to comments that it received and developed its response accordingly. And it also updated its feasibility modeling and cost calculations to better fit, to be more accurate. Even though maybe you were becoming more accurate, if Oklahoma versus EPA does require approval for a SIP, if the state had reasonably applied the five statutory factors, isn't it somewhat telling that in 2012, under the proposed rule, and the 2013 proposed rule, that EPA had at least initially, after considerable study, said that it's not, you know, that SCR is not the best available record for technology for a wide amount. And so it seems that, you know, maybe Pacific Court might be right, that you are deciding what the EPA thinks is BART, as opposed to whether or not it was reasonable for the state to, you know, to find that it wasn't BART. I guess I'm asking, even if there was an explanation for the deviation from the proposed rules, I mean, it does suggest the fact that the EPA had originally thought that it wasn't BART. Is some compelling evidence that SCR was at least, it was at least a reasonable determination that it wasn't BART? I think it's important to remember that across all three rules, EPA never believed that combustion controls was a reasonable determination of BART. And EPA, throughout its rules, found significant flaws and gaps in Wyoming's analysis. So there are two actions here. There's the fifth, disapproval, and then there's the fifth. And EPA reasonably concluded that Wyoming's analysis of the five statutory BART factors was deficient in all of those rules. It did originally think that SCR might represent BART in the 2012 and 2013 rules, but it reasonably concluded in response to comments in the 2014 rule that SCR represented BART. And part of that's because I think that Pacific Horse chart that it provides in its reply brief captures this actually perfectly. It says at the bottom, in the summary of the 2013 rule, that EPA originally concluded that the cumulative visibility benefits of SCR were not sufficient to justify its selection as BART. But EPA, in response to comments, determined that the visibility benefits of installing SCR at WIADAC resulted in the greatest visibility improvements at the most impacted Class I area, that's Wind Cave National Park in this case, were significant, and they were greater than the visibility improvements from the installation of SCR at any other plant in the Wyoming rulemaking. That's shown in the chart on page 121. In response to your adversary, however, who says, well, the CAA doesn't actually say that. And so Wyoming had a reasonable determination that it was looking at cumulative effect on visibility, and it was at least reasonable not to pinpoint the visibility perspective on particular Class I areas, and that that was at least a reasonable determination in formulating this data. Two responses to that, Your Honor. First, Pacific Horse's argument about cumulative visibility improvements, I think that's the first time I've heard that argument. So to the extent Pacific Horse's argument that EPA's use of the cumulative visibility metric or consideration of the most impacted Class I area in addition to cumulative visibility, without cumulative visibility being able to detract from that analysis, was unreasonable, I think they've waived that argument. Second, I think it was EPA's Wyoming SIFT and its analysis of the visibility improvements that would result from these NOx technologies was deficient in a number of ways. EPA SIFT's approval was well-grounded in the Regional Haze Rule and the Clean Air Act. Another type of visibility modeling that it failed to provide was for selective non-catalytic reduction. Wyoming did not model the visibility improvements that would result from that technology at all, despite finding that it was technologically feasible, and costs did not prohibit its installation. Didn't Wyoming agree that technology could have been feasible, but then it looked at the cost of installing the technology, and correct me if I'm wrong, but $175 million in change versus $18 million in change. And if those are accurate numbers, even if Wyoming agreed with the modeling that you're describing, wouldn't the cost be a factor that they could reasonably assess in deciding not to go that route? EPA reasonably found that Wyoming's SIFT and its evaluation of the cost was deficient as well, so there were multiple ways that Wyoming inflated the cost associated with selective catalytic reduction. The first is that Wyoming included allowances for funds used during construction and owner's costs and its cost evaluation without providing supporting documentation to justify the inclusion of those costs, which differs what, by contrast, Pacificore did provide vendor bids for Notton Units 1 and 2 and Dave Johnson Unit 2. And Wyoming also relied on capital costs to reject SDR, but its numbers were inconsistent with the administrative record because they exceeded the cost associated with actual SDR installations, according to industry studies that were identified by EPA in the final. What does EPA think the correct installation construction costs would be? If you disagree with the $175 million, what was EPA's conclusion that a more representative cost factor would be? EPA does not set thresholds for what the cost must or must not be in order to determine what is the best available retrofit technology. It requires a reasonable five consideration of the factors. That is not the case here. So EPA reasonably disapproved Wyoming's bar determination for WIODAC and promulgated a SIFT. So you don't have a position on what the cost would be for the SIFT technology decision? I think that the costs that were associated with SDR at the installation of WIODAC were reasonable per its rule, but no, there's not a bright line rule about what costs would or would not be reasonable. I don't think that's what he's asking. I don't mean to talk over you, but I thought in your brief, actually, you had said specifically how much the over-calculation was, and I thought it was like $3 million. Did I make that out? I don't recall off the top of my head right now, Your Honor. I thought you had said how much less the cost was for the construction cost for SDR versus based on what you had just said in your brief. Even if we did, I don't think that would mean that EPA had set a threshold for what a reasonable cost of the SDR installation would be, that it would apply broadly. So if you're not setting a threshold yourself, how are you passing judgment on what their costs are? Because their costs were including factors that EPA finds it unreasonable to include in the calculation. And where did your factors come from? Those are partially informed by the control cost manual and the BART guidelines. EPA's use of the BART guidelines is helpful guidance. Is that what you said in your rule, that you were using the BART guidelines as helpful guidance? Or did you say something more specific? I believe we said that we were using the BART guidelines as helpful guidance. Okay. Do you have any memory of maybe there being a statement in there that the failure to comply with the guidelines had something to do with the effect of your rejection of the SIP? EPA certainly referenced the cost control manual and pointed out where Biomids Analysis... Okay, now I'm asking you about specific language. Do you remember specific language that would have said that the failure to comply with the guidelines  had something to do with the effect of your rejection of the SIP? Because really, in the end, all we have to go on is the written word, right? Of course, your honor. EPA's rulemaking, I think, is overall consistent with our position here, that it did not require compliance with the guidelines. And I think there are other portions of the rule in response to comments where it notes that, the BART guidelines are not mandatory for WIODAC and it did not require compliance with them. Okay. Yeah, the rule does include where the guidelines require guidelines requirements in several places. I mean, they're not making up their mandatory argument, discussionary argument here. Do we disregard that language in light of arguments, or what do we make of the language that was actually used in the final rule? I think that to the extent that this court finds that any language where EPA references the cost control manual or BART guidelines in a way that seems like it's compelling compliance, I would ask that this court listen to EPA's explanation and direct response to comments about requirements with the BART guidelines where it said we are not requiring compliance with those guidelines. But I also think that this court can disagree with how EPA referenced the BART guidelines and still find that EPA's disapproval of Wyoming SIP was not arbitrary and capricious because its failure to provide different types of visibility modeling were inconsistent with the plain text of the regional HAZE rule and the Clean Air Act itself. Well, Miss, you know, we have, you know, we do have case law in review of administrative decisions that if an agency gives two reasons, one valid and one invalid, unless it is crystal clear from the record that the agency would have made the same decision without the invalid explanation, we're required to remand. We had a case several years ago involving an administrative review of the Secretary of State's determination on the issuance of a passport. And so I don't know that we can just disregard, you know, some of this problematic language where it suggests that the agency was relying on the guidelines as mandatory and just say, well, we're just going to overlook that because there was also an independent rationale that does pass Munster. I think it is crystal clear that EPA would have taken the same action to the extent that there is language in the final rule that doesn't seem consistent with EPA's position as is explained now or in other parts of its responses to comments. But because of those responses to comments, EPA did not require and recognize that it could not require compliance with the BART guidelines and control cost manual. It reasonably referenced them and also disapproved for violation of regional HAGE requirements and the Clean Air Act's requirements to provide certain types of modeling. And I know your time's up. One last question. If you can succinctly sum up for me, Wyoming SIP does not meet BART because dot, dot, dot. Fill in the blank. Wyoming SIP fails to comply with the BART requirement because it failed to provide two types of visibility modeling that are required by the regional HAGE rule and the Clean Air Act and its consideration of the anticipated visibility improvement factor and the cost of compliance factor were unreasonable. All right. And can I add, her opposing counsel went over a fair amount. I want to ask a couple of questions. So on your two types of modeling that you say their SIP failed because they failed to use two types of modeling, where do the two types of modeling come from, requirements that they use these two types of modeling come from? It comes from the regional HAGE rules requirement to consider the best system of emission control technology for each pollutant, and that's in 40 CFR 51.301. And it comes from the Clean Air Act's requirement to consider the visibility improvements that would result from the installation of such technology. And that's the Clean Air Act at 7491G2 and the regional HAGE rule at 51.301E12A. Okay. How do we, I guess my question is where do these models, I mean, how do we determine that these two models were the best ones for this and that a failure to use them makes a SIP vulnerable? I don't think that we're arguing about different types of models here. I think we're just arguing about modeling generally that Wyoming failed to provide different elements of the SIP, including the installation of NOx controls alone and the anticipated visibility improvement that would result from the installation of NOx controls alone. Okay. So you're not complaining about a method of modeling. You're complaining that they didn't do the modeling at all. Yes. Their modeling has significant gaps that did not comply with the regional HAGE rule in the Clean Air Act. All right. I have one more question. So, Judge, I'm going to take Judge Bacharach's word for it that somewhere in your briefing is a $3 million number that we're going to take it, we're going to assume. I thought I had some qualifiers. He did. He had qualifiers. That's why I'm, you know, we're assuming for purposes of argument only that this $3 million number that he was talking about was off. And overall, we're talking about in excess of $100 million of retrofit expense. Do you agree with that? Yes, Your Honor. Okay. So I guess what I'm wondering is if somebody's numbers, for whatever reason, are off by $3 million when you're looking at $100 million plus expense. I mean, is that enough discrepancy in their cost projections to, you know, up in their set? I think the factor is that I think the discrepancies inflated the cost and EPA reasonably considered that and also... No, I understand that. But at some point, don't we have to have some materiality? I mean, if it was $50 million, probably nobody would even question you about it. And it may be. Judge Beckerach's number may be off. But if it's $3 million, it's a lot different, isn't it, than if it was $50? EPA's evaluation of whether SDR should be installed was also informed by the incremental cost effectiveness and the average cost effectiveness of these technologies. Well, I mean, how do you know that, though, if you didn't do any numbers for yourself? You said EPA doesn't do these numbers. You know, we just look at their numbers and decide if their numbers are off. I mean, how do you do the analysis if you don't have a number to prop up against theirs and say theirs is wrong, this is the number? EPA did conduct revised cost analyses, and it found that the average cost effectiveness and incremental cost effectiveness of the installation of SDR at Liodac was consistent with the number that it found in its FIPS that was consistent with the installation of SDR at other FIPS. It was consistent with other FIPS where EPA had required the installation of SDR. What was the difference between the number in your FIPS and the number in their SIP for costs? Do you know? I believe I can find that, Your Honor. Okay. If you need time, I can look at it while your colleague is talking about it. I can look it up myself. Why don't you look it up while your colleague is talking about it and then you can tell us when. Sure. I can try to find the exact numbers. I would say that EPA's analysis was not dependent on just that one number. EPA's consideration of considered all five factors in promulgating its FIPS and requiring SDR. Additional questions? Yeah. Okay. We have some rebuttal. Thank you, Ms. Langner. I appreciate that. I'll give – Wyoming has two minutes, and if you want, Mr. Jones, you can have two minutes also. Okay. Reasonable minds can differ. It is very telling that most of what EPA just cited were from the guidelines, except for the best-in-system emissions technology. Let's go back to that. Our differences in visibility, even taking EPA's own data, is 0.4 between Wyoming's control and EPA's control. And both of us agree that it costs at least $100 million more in capital costs to get that 0.4 decibels. And it would take 2.4 megawatts more electricity and parasitic electric costs to install SDR and environmental costs, including ammonia slips, which can cause a visible plume, which can actually detract from the visibility benefits you're trying to get. And so it's important to look at all that in a holistic manner, which Wyoming did. Are you saying that even if you made some mistakes, that EPA has identified they're harmless? What I'm saying is that, one, Wyoming did not make mistakes. We did our own interpretation of the guidelines. EPA even said their guidelines is a legal interpretation. We could do a different method. But second is that EPA keeps talking about how our result ended up in an unreasonable analysis. However, if you look at the numbers, the numbers are very close together. I thought they were on average incremental costs. There was a significant difference. Am I wrong about that? If I remember correctly, I think there was about a $2,000 difference. But they were both what we considered on the high end for incremental costs. So I think that doesn't change too much about how that even EPA, even though EPA was wrong in correcting their numbers, their numbers still showed higher end incremental costs. All right. I think your rebuttal time has expired. Thank you, Mr. Jones. Three quick points in rebuttal, your honors. The court focused a lot during EPA's argument on modeling and cost analysis. I want to emphasize those are five, what are the five factor analysis. They are not applicable factors. And yes, it is true, and Judge Carson's questions went to a very good point, you have to have a materiality if you're going to do that analysis. But it's the state that does that analysis. I just need to emphasize the congressional direction. Modeling and that cost analysis are not applicable factors. The last point I want to make on rebuttal is that if we're going to talk about modeling, we made the point in our brief that the CalCos modeling, which Judge Backpack referred to in one of your questions, the margin of error subsumes the depth of view improvement that it was assumed to take place. Did you make a comment in connection with the proposed rules with the margin of error for CalCos? Yeah. The margin of error for CalCos is the depth of view improvement. Where in the administrative record can I find, because I didn't see a comment in response to the proposed rules on the margin of error. I saw that you commented about the imprecision of CalCos, but I didn't see the argument that you made in the briefing that the difference was within the margin of error. Where can I find those comments? The comments are dated August 12, 2013. I can give you the exact site. I've got it here in my tabs. The thing that I want to emphasize, and I'll find it before I sit down, did you want to interrupt? No, please. Okay. The reason that that matters is when those comments came in, and the course question is valid, but the comment that was made was, you can't make this judgment when your model has a margin of error that goes beyond that. And that is the exact same argument that was made in the Ninth Circuit case, the National Park Conservancy Association, and the Ninth Circuit said, you completely ignored that comment. And they did the exact same thing here. They said, we will come and use a 98th percentile metric, remember that from the record, and that that's conservative enough that you don't have to worry about the fact that the margin of error is larger than the death of you reduction. And the Ninth Circuit stopped that exact same argument and said, it's not perceptibility, but it's the model's ability to anticipate improvements at a level allegedly within the margin of error. So to go to Judge Carson's question, that he asked counsel, this is a quote also from National Park, but tailored to this case, it's arbitrary and capricious for EBA to force an emission source to spend millions of dollars, in this case, hundreds of millions of dollars, for new technology that will not appreciably have an impact on a classroom area. It was .012. Yes. And here, the margin of error, I've got, here, let me look at it. I'll pull it up. Oh, I have it. I'm reading now from the record at 79 FEDREG 5114, I think is the reference that you would be looking for. And while we wait, I'll confirm that, but I think that's where you can find it. All right, thank you. Thank you. All right. Appreciate your arguments. Okay, let's shift gears to Naughton. Did you find what you were looking for? Your Honor, I haven't found a direct capital cost number that would mirror the million dollar number that Judge Carson pointed out. Wyoming's average income rental cost was $4,252 a ton,  the incremental cost was $8,147 a ton, and EPA's calculation of the incremental cost for SDR was $6,233. Do you have the record site in front of you for that? I believe those numbers are in a brief. I don't have that on the phone. Yeah, I'm pretty sure they're in the brief. I recall those. Okay. In our brief, we also cite the kilowatt hour, the cost per kilowatt hour in capital costs. All right, thank you. And I want to be clear, Judge Bacharach, that was Judge Bacharach's number. I think you said that three times. Okay. All right, Ms. Harbein, for the confirmation groups, you may. Let's see, do we have room for everybody? Could you make room? I'm going to invite you to speak. I'm going to invite you to speak. Our judges will be more prepared. I'm going to invite you to speak. We charge railing that day. Okay, now, for this part of it, we have two arguments. One from the conservation organizations, and then EPA and Pacific Corps are going to split your 15 minutes. Is that correct? That's correct. Okay. All right, with that understanding, let us proceed with the conservation groups. Ms. Harbein, why don't you introduce yourself and proceed? Good afternoon. May it please the court, Jenny Harbein on behalf of the conservation petitioners with me at council table, and I apologize for a victim, Mr. Jones, but this is my co-counsel, Emily Schill. I'd like to reserve three minutes of my time for rebuttal. Pacific Corps' not-in-coal plant in southwest Wyoming causes noticeable visibility impairment in all of the state's seven class one areas, including Yellowstone and Grand Teton National Parks, and Wyoming's visibility modeling showed that of all of Wyoming's coal plants, Notton creates the greatest visibility impairment in the state, but unlike the Wild Act facility we were just discussing, EPA did not require the most effective pollution control technology for Notton's NOx pollution. It didn't require the second most effective technology. Instead, EPA ratified Wyoming's determination that the plant's existing combustion controls, the least effective NOx pollution control technology constitute BART. I'll begin by explaining why EPA's not-in-BART analysis ran counter to the record evidence. Before you do that, if you find, talking a little bit about prudential movements, if Pacific Corps is going to close, I mean, they are, as I understand your argument about that EPA has approved what Pacific Corps has said, that they have filed a brief to us that didn't have any qualifiers saying that they are closing Notton 1 and 2 prior to the end of 2025. And, you know, even if we say for constitutional movements, okay, well, you can put in SCR tomorrow, the useful life is unquestionably going to create a completely different inquiry, isn't it? Now we're talking about, you know, maybe $200 million or a million dollars for a year and a half, assuming it's put in tomorrow. I'll explain why this case is not moot and want to start with Wyoming's helpful formulation of the issue in response to the court's request for briefing, which is there's no such doctrine as a may become moot doctrine. And that's exactly what Pacific Corps is advocating here. So Pacific Corps says, we filed these statements of intent that we're going to stop burning coal at the Notton facility at the end of 2025. And what they point to is a request they submitted to EPA to approve a plan to close certain coal ash waste impoundments in October of 2028, in order to comply with separate regulatory requirements to properly dispose of its coal waste. To meet that deadline, the request built in a schedule that says the Pacific Corps will stop burning coal at the end of 2025, which conservatively allows for a couple of construction seasons to close that facility after they seize burning coal. Importantly, EPA has not approved that request. Well, Pacific Corps in a minute gets up here and says, regardless of what the EPA does with regard to surface impoundments, we are unequivocally, without qualification, closing Notton 1 and 2 by December 31st, 2025. Would you agree it's necessary that it's at least prudentially, practically new? Because the analysis under the CAA for Notton 1 and 2 is clearly going to change if the useful life for the source is only a year and a half. No, I would not agree under that circumstance, that the case is either constitutionally or prudentially new. We would have a different situation if Pacific Corps was bringing to you an enforceable requirement to close those units in 2025. That's not what we have. At the end of the day, if EPA approves, following notice and comment rulemaking, if EPA approves Pacific Corps' alternate closure plan for its waste impoundments, the enforceable date we have is October 2028 for them to close the impoundments. And then we're relying on an aspirational schedule in the interim. But as this court well knows, we've seen a lot of changes over the years in terms of what Pacific Corps plans are and even what EPA's plans are for the Wyoming coal plant. What will happen at Notton in terms of retirement, in terms of its commitment to continue burning coal, remains to be seen. What we have here is a present duty of EPA to enforce the regional haze provisions of the Clean Air Act to require the installation and operation of best available retrofit controls. And the conservation organization's petition for a remand and vacater of the Notton BART determination in 2014, no circumstances have changed that would make remand and vacater ineffectual relief today. On the merits, there are two ways that EPA's Notton BART determination ran counter to the record evidence. First, EPA gave controlling weight to one aspect of its cost analysis, incremental costs, to override every other aspect of its BART determination that supported a finding that SCR is BART. And second, EPA arbitrarily inflated SCR control costs. And each of these problems independently provides reason for remand and vacater of the Notton BART determination. First, the incremental cost issue. As we've been discussing, Congress identified five factors for evaluating. And they disregarded the other factors or they improperly weighed them? Our argument is that they used incremental cost effectiveness to override all the other factors. And if we look at what the analysis was, so EPA says that there are two factors that are most important, cost and visibility benefit. On visibility benefit, EPA conducted the modeling and said, we think that these visibility benefits source-wide are significant. And even taking each unit individually, the visibility benefit supports a finding that SCR is BART. Then they looked at cost effectiveness. And this is the metric that looks at the dollars per ton of pollution reduced across EPA's HAZE rules. It's the standard cost metric. And EPA said the cost effectiveness of SCR is reasonable. Actually, even Wyoming said the cost effectiveness of SCR is reasonable. And if you look at the costs, particularly for Not-in-Unit-2, which EPA helpfully describes in its brief in a table on page 34, the cost effectiveness of SCR on Not-in-Unit-1 or Not-in-Unit-2 is the lowest of the cost of all of the units, BART units in Wyoming. Lower than all of the units on which EPA did require SCR. Then it looked at incremental cost effectiveness. And this compares the cost of the most stringent control, SCR, to the second most effective control. And EPA said, well, that number is simply too big. Two things to note about this conclusion. The first is that the final rule identifies only incremental cost effectiveness as a factor that weighed against a finding that SCR is BART. But it's also important to note that although EPA's rejection of SCR rested on its comparison of that technology with the second place technology, EPA also didn't require the second place technology as BART. So is your position that no matter what the cost, that factor alone can't override the other four factors in an analysis? No, that's not our argument. Our argument is that EPA has to rationally explain why incremental costs are the overriding consideration appropriately in a BART determination. And that is analogous with the 2015 National Parks case from the Ninth Circuit where EPA rejected SCR for a Montana coal plant based on the agency's conclusion that the visibility improvement wasn't worth the cost. And the court said you can consider costs in your BART analysis, EPA, but you have to, quote, cogently explain why you've exercised your discretion in a given manner. Okay, so the issue that you have today is that EPA didn't explain why the incremental cost overrode all of the other factors. Yes, that it didn't explain it and that it didn't explain it in a way that, you know, would allow us to make any sense of this record. And I want to note here, and this is actually relevant to the WYODAC argument as well, is that EPA also has a duty to ground its decision-making, to identify the reasonableness of BART controls with respect to the     And that is a duty that EPA has. to the overarching purpose of the Clean Air Act regional HASE provision. EPA in its brief dismisses the Clean Air Act's visibility improvement mandate as an overarching consideration, but it appropriately recognized in the final rule that, quote, And here Wyoming's BART determination leaves the state 100 years off the mark, off EPA's 2064 benchmark for achieving natural visibility conditions. And in these circumstances, again, this goes to the WYODAC situation as well, the standard is flipped where you don't meet that rate of progress that EPA has defined in the regional HASE rule as reasonable rate of progress. Then the state has to show why more stringent BART controls are unreasonable. And EPA has that same obligation. But it simply didn't meet it. Independent requirements to determine what is BART and also to set the, you know, reasonable progress toward natural visibility by 2064. But I didn't think a reasonable progress requirement was caked into the analysis for BART. Am I misreading that? Yes. The Clean Air Act requires EPA to identify BART and other measures in order to achieve reasonable progress. Now that doesn't mean that the 2064 benchmark is enforceable somehow, but it is a guideline for determining what is reasonable. And in the regional HASE rule at 308C1, little numeral 2, EPA explains that this really flips the burden to explain why a slower rate of progress is reasonable and it's not achievable to meet the reasonable progress benchmark with more stringent controls. You want some rebuttal time? I will and I'll take the retro factor issue for a briefing and be happy to answer questions on rebuttal. Thank you. Great. Thank you. All right. Let's hear from EPA. Michelle? Good afternoon. May it please the Court. Sonia Shea on behalf of the United States of America. I'd like to reserve three minutes of my time and any time I might have remaining for Pacific Core. EPA's approval for Wyoming's determination of BART for not in Units 1 and 2 was reasonable and should be upheld. First, this Court should reject Conservation Organization's attempt to graft additional requirements onto the five-factor BART analysis. Second, EPA reasonably approved Wyoming's conclusion that combustion controls, not SCR, is BART for not in Units 1 and 2, and assessed all the five factors and did not apply a retrofit factor in calculating cost effectiveness. Additionally, no intervening events render this case moot. Conservation Organizations argue for additional requirements that would all but require choosing the most stringent control as BART, but that is not what Congress intended nor how EPA has interpreted the statute through the Hays Rule. BART is determined by a reasonable application of the five statutory factors and is part of achieving reasonable progress toward the national goal of remedying human cost, visibility, and permit in scenic areas. Should we be looking at what EPA did, or should we be looking at the Wyoming SIP in evaluating the conservation challenge here? You should be looking at what EPA did, and it is under the arbitrary and capricious standards of review. What EPA did was approve Wyoming's SIP for not in, and specifically for not in Units 1 and 2, EPA determined after calculating the cost and visibility factors, conducting its own visibility analysis as it did for the WIODAC facility, that it had found that the combustion controls were not an unreasonable choice that Wyoming had made, and so EPA approved the determination. Specifically, EPA looked to both the cost and visibility factors in its analysis of Wyoming SIP, and what it found was that overall, in assessing the five statutory factors, and EPA did consider the other three factors as well, that what Wyoming had done for not in, even though it had the same flaws as WIODAC, the ultimate result was reasonable and was approvable. So, as Ninth Circuit has held in Darwin, the Act sets out standards for BART that are freestanding, source by source, and are not dependent on the long-term visibility goals identified. BART is from the five factors, and there is not an overlay of reasonable progress onto it. Reasonable progress is a different statutory requirement. I would note that on visibility, for visibility improvement for SCR at not in Units 1 and 2, EPA found that the invisibility improvement would be less than half what EPA had projected in the proposed rules. And for not in Units 1 and 2, there was also low incremental visibility due to SCR when compared to SNCR. Additionally, EPA found that cumulative visibility improvement for not in Units 1 and 2 was around half the values that EPA had projected in 2013. So, these findings on visibility show not only that EPA considered this factor in its analysis, but also that EPA considered visibility benefits from SCR at not in Units 1 and 2 to be substantially less than it had anticipated in the proposed rules. And as shown in chart one, our brief at page 136, EPA did not require SCR as BART for any unit in Wyoming with visibility improvement values below 0.5 decibels. For COPS, although... I do respond to the environmental groups' argument that, well, these are apples and oranges, because David Johnson, all of these other units have their own combination, as we just heard for 40 minutes, all of these unique factors that go into what is BART for each one of these plans. And so, your color chart is very clear, but what is missing is all of the unique factors, all of the modeling issues, all of the individual components that went into each one of those other plans. That was the argument. How do you respond to that? Right. So, BART is, by its nature, a comparative process. And as EPA has recognized, the COPS and the visibility improvement are usually the primary factors that are looked at in the BART analysis. So, what EPA has done and what EPA does do when it reviews the BART analysis is also look to other decisions, looking at those factors and trying to get kind of a more apples-to-apples type comparison by using things like the BART guidelines, where you have a standard that's applied throughout. So, for example, in this case, we have EPA having calculated incremental cost effectiveness and average cost effectiveness for all the units using a very similar methodology. So, the comparison across the units is more meaningful than if the methodology would have been different for each source. And, indeed, Wyoming tried to use the same methodology and the guidelines as well when it made its calculations for what is BART, the various units. Can I ask you this? You know, quite a little bit to get with this point. Your colleague, in your briefing on the Wired Act and Pacific Works Challenge, has justified the discrepancy in the treatment between Wired Act and all of these other facilities to counter the argument that, well, it's the same visibility and cost flaws took place across the board with all of these other Pacific Works plans in Wyoming. But the EPA came in and said, well, the results are reasonable and, therefore, we're going to, you know, approve the SIP. And then, now, you come in and say, well, because the average incremental cost was so much higher in these other facilities where we didn't require SCR, then that explains, you know, why we're not requiring SCR for Norton 1 and 2. Well, all of that presupposes that you had a legitimate reason for not requiring SCR at all of these other facilities. And nobody has really gotten into the weeds on that. Right. So our primary argument isn't that it's consistent with the other facilities, but that in the BART analysis on Norton units 1 and 2 specifically, what EPA found when it looked to the calculations that it had for visibility and when it looked to the calculations that it had for cost, that the incremental cost effectiveness was very high and, as we pointed out, was high compared to other facilities. But in and of itself was very high for Norton when compared with and paired with the visibility improvements from SCR at the Norton units, units 1 and 2. And so it was really that comparison of the Norton unit itself, Norton units 1 and 2, the cost effectiveness and the visibility factors, that led EPA to find that it was reasonable for the state to reject SCR as BART. But, again, the comparison of the other facilities helps to show and demonstrate that reasonableness. For cost, although EPA considered average cost effectiveness values to be acceptable, as I said, the incremental cost effectiveness numbers were significantly higher than either of the proposed rules when EPA had calculated those numbers or when EPA had looked at those numbers previously. And, again, they were beyond the upper end of the range of what EPA had found acceptable in other actions. Across the units in Wyoming, EPA did not require SCR where the value for incremental cost effectiveness was above $8,000 per ton. So, ultimately, in light of those two factors and having looked to the other three factors as well, EPA concluded that the visibility improvement from SCR for Norton units 1 and 2 did not justify the incremental cost effectiveness figures. And that is also consistent with a portion of the BART guidelines where it envisions a scenario where average cost effectiveness may be acceptable, but the incremental cost effectiveness value is high compared to the emissions reduction achieved between a control technology and the next most stringent control technology. The challengers here say that the agency gave controlling weight to, you know, this incremental cost factor. And, actually, you might agree with that. And I just wonder, do you agree that the agency did give controlling weight to that incremental cost factor? And if you do agree with that, is your position that you're entitled to do that? That's an appropriate way to consider the five factors. I wouldn't agree that it's controlling weight because EPA did look to the other factors that make up cost, including average cost effectiveness. And, specifically, they looked to the visibility improvement that could be achieved with SCR and found that compared to the incremental cost effectiveness number that was so high that the visibility achievement did not offset that and did not really push for SCR. So, while incremental cost effectiveness was kind of the, I guess, overriding cost factor that EPA looked to, it was not necessarily the overriding factor in the BART analysis itself. Is that because there's a weighing of the other factors? That's correct, yes. And, in this case, EPA found that the other three factors did not really weigh in favor of necessarily one of the control technologies over another. But, mostly, in this case, EPA looked to incremental cost effectiveness and to visibility in making this determination. I'd like to address the retrofit factor issue for a moment, too. So, EPA did not apply a retrofit factor to calculate incremental costs, and it did not use the IPM cost estimate in estimating costs for not in Units 1 and 2. Instead, EPA used vendor estimates provided by Pacificorp, and the administrative record demonstrates this, including the Andover report and its supporting spreadsheets. We directed the court and conservation organizations to the portions of the administrative record that demonstrate that in our brief, and conservation organizations do not dispute the contents of the record. The record shows what it shows, and that is that EPA did not apply the retrofit factor to calculate costs at not in Units 1 and 2. EPA could have provided perhaps more narrative detail on how it calculated the incremental costs, and I see that my time is almost up. I'll give Pacificorp three minutes, and I'll go ahead and finish that point, and I had a different question. Sure, yeah. So, EPA could have provided more explanation on it, but it is readily apparent from the final rule and in the administrative record. On mootness, there's a Pacificorp's proposal that's pending, and building on Judge Bachrach's earlier line of questions, can we expect a decision by the agency on Pacificorp's decision to mothball those plants, or what kind of mothballing? It's already been a couple of years. Are you referring to the coal combustion residual rule application that Pacificorp submitted? Yes. So, I don't have any information on when EPA is planning to act on that, but I know that, you know, EPA has received it. I think even if we assume that EPA would act soon, I don't think that that necessarily moots the case here, because Pacificorp could choose to do something different than what is represented in the application. Pacificorp would not need necessarily to shut down the two units and cease burning coal at Naughton to close the Ash Pond impoundment. It's possible that Pacificorp could decide to retrofit the impoundment, or Pacificorp could potentially haul waste off-site. So, at this point, at least currently, there is nothing in the record that we have, or outside of the record, that shows that the case is moot. What we would be looking for would be a federally enforceable and binding commitment that Pacificorp has made, and they have not made that through their application. They have not made that through comments on Wyoming's second planning period SIP, nor in their integrated resources plan. So, all of those statements could change, are not binding, and do not create a federally enforceable requirement that would moot out the BART issue in this case. All right. Mr. Jones? Can I ask one question? Sure, Jim. Does Pacificorp have the unilateral right, without the approval of the EPA, to represent, to commit Pacificorp to closing, to terminating the burning of coal at Naughton 1 and 2? EPA, you know, may say, okay, well, we're not going to approve that. Your plan, with regard to surface impoundments, maybe we're going to do something to require you to do it in addition, to do something with surface impoundments for solid waste. But he does have the right, without EPA blessing it, doesn't he, to say, 10th Circuit, we are unequivocally going to quit burning coal at Naughton 1 and 2 by December 31, 2025. They can certainly say that, but I think they could also change their minds. And at this point in time, the units are still operating, and so the case is not yet moved. Okay. Thank you. Thank you. With that, excellent segue, Mr. Jones. I could not agree more. That was perfect, anyway. As you can imagine, I'm going to focus on movements. It's the party that moved to have the case, the environmental organization claims it's Mrs. Moot. I agree completely. We can make a voluntary assertion. It goes further than that. The demonstration is required under the CCR rule, requires that Pacific Corps show that it has no other alternative. So it's not a unilateral decision. You're right, we could do that. But we went much further than that. But it's even more important that the court recognize that contrary to the position that EPA has advanced, there is an enforceable rule that will require Pacific Corps to stop burning coal at knot one and two. That's the CCR rule itself. The reason that the demonstration was offered, said we're going to voluntarily do this, was because if we didn't do that, the plant shuts down. We cannot put coal combustion residuals into that pond unless we take another alternative. That's the enforceable rule. Just to make sure that I totally understand it, without regard to whatever the EPA does or doesn't do tomorrow, next year, or five years from now, are you committing on behalf of Pacific Corps that you will, that knot one and two will stop burning coal at those two units by December 31, 2025, and will not resume, will not change your mind, will not restart burning coal at knot one and two? Yes. I'm very aware that we're live streaming and that we're on the record, and that's a record statement. But yes. And the reason I'm so confident in making that statement is we've said that. We've said it in the demonstration, and we have to demonstrate this by call the demonstration. We don't have an alternative. But I was answering counsel's question, which is, well, it's not enforceable. They could change their mind. The answer to that is no. The CCR rule that they adopted requires us to cease burning coal, even if we wanted to change our mind. And the last point I want to make here is to make sure that the court understands that mootness goes to the specific remedy that the plaintiffs or the petitioners in this regard, in this case, asked for. If you order SCR today, there is no way it can be done by the time that that commitment that you just asked me to make on the record is fulfilled. So it doesn't matter. It doesn't matter whether we go by the demonstration, the CCR rule. CCR, I mean, SCR, you can understand how I'm having a hard time there. The imposition of SCR on a coal-burning plant cannot take place. Full stop. You could order the remedy that they're seeking today, and it cannot be implemented before Pacific Core ceases burning coal at knot one and two. That, by definition, is moot. That's not just prudential mootness. That's constitutional mootness. And I just wanted to, you raised a question to EPA, and I wanted to give you the record You wanted to know where the depth of view difference was. There's tables 53 through 56 in the 2013 rule. That's 78 Fed Reg, Fed Reg 34783, if you want to look that up. Thank you, counsel. Thank you. Ms. Harmon, you have three minutes. Starting with mootness, Pacific Core has not bound itself through its representations to EPA. It has not bound itself through representations to this court, which my clients have no ability to enforce. The operative deadline in Pacific Core's representation to EPA in the coal combustion residual rule context is October 2028 to stop using the coal ash waste impoundment. We don't have complete briefing on the operation of the CCR rule for this court to analyze, but I'd represent that it's outside of the purview of this case. Further, petitioners are not asking this court to order the installation of SDR. Instead, to order a remand. If Pacific Core wants to bind itself to an enforceable promise to cease burning coal at Naughton, it can request that EPA do this in its remand consideration of BART controls. And that's where it's appropriate to consider the remaining useful life of the plant. If we do vacate the final rule and remand, would the useful life of the source, Naughton 1 and 2, be an appropriate consideration? Absolutely. It's one of the five BART factors. And EPA has said that it's an appropriate factor when the useful life is shortened by an enforceable commitment to stop using the plant. On the merits, EPA represented that the conservation organization's approach would always result in the most stringent controls on a unit. I want to address that. It's certainly not the case. Our argument about the Naughton plan is specific to the analysis that EPA performed for that plant, which found significant visibility benefits of SDR and highly cost-effective controls. And further, the alternative of the least stringent control technology precludes timely achievement of reasonable progress. And it's under these circumstances that EPA had to explain why SDR wasn't required and the least effective controls constitute BART. In terms of whether or not incremental costs were the overriding factor in EPA's consideration, I'd point the court to the final rule at JA119, saying that the visibility improvements are significant, that SDR is cost-effective, and it's the incremental cost-effectiveness that was driving EPA's decision. And third, on retrofit costs, EPA doesn't defend its retrofit factor. It points this court to formulas and spreadsheets to explain its decision in the final rule. But even if we—may I complete here? If we accept that EPA used vendor estimates in lieu of its own analysis incorporating retrofit costs, that's troubling to say the least, where EPA in the final rule critiqued those estimates as, quote, perplexing and, quote, well in excess of what other SDRs have cost. That's at JA209. So either EPA relied on an excessive retrofit factor or on excessive vendor estimates. Either way, this undermined the final rule. BART presents a one-time opportunity and a necessity to make significant progress toward achieving the natural visibility mandate of the Clean Air Act. And we request Greenman and Baker for EPA to correct its errors and for the Norton coal plant to meet its statutory obligation. Thank you. Thank you, counsel. Counsel are excused. We appreciate the arguments this afternoon. They were very helpful, at least to me. And counsel, again, are excused, and the case will be submitted. The court is in recess until 9 a.m. tomorrow. Thank you.